25-254, Cheryl Cox v. City of Rochester et al. Thank you, Your Honor, and may it please the court. My name is Emmett Wachowski-Eldred. I'm here for Appellant Cheryl Cox. I have three points I want to make today, Your Honors. First, the District Court correctly held that a reasonable jury could find that Officer Van Breda Road violated Ms. Cox's Fourth Amendment rights by unreasonably shooting her dog, Taz. Second, Officer Van Breda Road was not entitled to qualified immunity. It is clearly established in this circuit that police may not unreasonably shoot a pet dog. The fact that Taz survived the shooting is irrelevant to the qualified immunity inquiry because to determine if a right... Well, that's the question, right, whether it is clearly established that it's a constitutional violation to shoot the dog. Right, so we've said that it's a constitutional violation to kill the dog, but why isn't that because something amounts to a seizure if you have the destruction or a complete deprivation of an item of personal property, but it's not a seizure if there's something we might call property damage that doesn't amount to a seizure. And what may be an injury to an animal is like damage short of destruction. So, Your Honor, if you agree with the District Court that there was a seizure here because there's been a meaningful interference with the possessory interests of Ms. Cox... No, I think that's the question. No, but I would say maybe I don't. So why isn't the answer, well, the Supreme Court says meaningful interference, and that is supposed to amount to a seizure, which means it is either the complete destruction or something equivalent to a deprivation of the piece of personal property. And that happens when you kill a dog, but it might not happen if you injure a dog. Your Honor, the standard is a meaningful interference, and if you look at this, the Supreme Court... The Supreme Court says that the standard is meaningful interference with property interests. Yes, Your Honor. The standard is a meaningful interference with possessory interests. So if this was a suitcase rather than a dog, and the owner of the suitcase was deprived of the property for a period of several hours by the police, that would be a seizure, wouldn't it? Yes, Your Honor. That's pretty much exactly the pattern. It doesn't have to be destroyed or it doesn't have to be lost and then never returned to the person. So if the person has never again seized the suitcase, yes, the police take it. Yeah, but did the police take the dog in this case? Interfere with the possessory interest in a significant way, that is a seizure. Your Honor, that is correct. The case that sounds like you're describing is United States v. Police, and that was the exact back pattern where there was a temporary seizure of a suitcase at the airport, and that was enough for the Supreme Court to say there's been a meaningful interference with possessory interests. Okay, so I don't think that – I think it's... And when it's a seizure of a person by the police, that seizure is not – it can be effected without killing the person, right? Your Honor, that's correct. Of course, this is a property-based inquiry, which is a slightly different inquiry than applies in that scenario. But again, the standard is has there been a meaningful interference with the possessory interest. So what was the meaningful interference here? I mean, like the suitcase was taken away for an hour. Was the dog ever taken away? So the dog was never taken away, but we think that there are a number of ways to see a meaningful interference here. With the possessory interest, right, not with the integrity of the object. Correct, with the possessory interest. Okay, so what was the meaningful interference? Just tell us what that was. So for one thing, Ms. Cox's use and enjoyment of her animal is different now than it was prior to that. So she doesn't have the dog? No, she has the dog, but her use and enjoyment of the animal is different. But that's – no, but how is that possessory? Your Honor, it's – Because a possessory interest is different from the quality, right? So if you scuff my suitcase, but I still have it, you've never interfered with my possessory interest in the suitcase. You have damaged its value to me. Yes, Your Honor. So how is that – just get to the point where it's meaningful interference with the possessory interest with the dog. When did that happen? Or you're saying it's happening even today. So it happened at the time of the shooting, causing injuries, it has collapsed, he needed to be taken to the vet. Did the police take him to the vet? The police did not take him to the vet, but Taz had to be taken to the vet. That's a period of time where Ms. Cox is not able to possess Taz the way that she otherwise would. So let me ask you this. It's not in the way, but she had control over the animal. Like she was in charge of his being admitted to the vet. Your Honor, that is correct, but the standard is a meaningful interference. So let me ask you this. Let's say the police – different scenario. Forget the dog because maybe people think about dogs differently. I don't know. Different hypothetical. The police are called to this house, 911 call, same scenario, and there's a car parked in the driveway. And the police officer maliciously says, you know, I don't like you, Ms. Cox, I don't like your car. And he takes a billy club and he smashes the rear window. Yes. And then he just leaves and that's it. At some point, Ms. Cox decides, well, I want to get the window fixed, brings her to the body shop. Yes. And they spend, let's say, an afternoon fixing the window. Your view would be because the police officer broke the window, was there a meaningful interference with her possessory interest of the car? And if so, when? Your Honor, yes, we believe there was a meaningful interference with the possessory interest. And the interference occurred when the window was smashed and until she's been able to take it to be repaired. What if she never fixed the window? If she never fixed the window. You're saying that the broken, the moment he broke it, she had her possessory interest interfered with? Yes, Your Honor, because she's not able to use the car. Why not? No, no, no, I've posited you broke a window, rear window, you can drive it. Sure, Your Honor, she has to take it to get repaired. Why does she have to? If she wants to use it in the way that she's entitled to use it as the owner of the car. Okay, what if he had keyed the car? He was, again, malicious, he took his key and just scraped it. Maliciously. You don't have to fix it, it's ugly. Sure, I guess where I'm going with this is, are you not collapsing tort law with the Fourth Amendment? Your Honor, with the example of the keying of the car, we do acknowledge there's a point at which the interference is de minimis, and at that point there's not a seizure. We don't think that that's the circumstance. What if he shot the wheel of the car, shot the tire of the car? Yes, Your Honor, if he shot the car. If I was out in the driveway, suppose we're on the road and the officer pulls the person over and says, you know, I'm a little concerned about if you're going to run away, so I'm going to shoot the wheel out of the car. Doesn't that interfere with the possessory interference? Yes, absolutely it does, Your Honor, because she's not able to use the car for the purpose of— For the purpose that it was intended to. Yes, Your Honor, and we've pointed to a number of cases— So in that kind of a case, you're saying the driver of the car can sue the police officer under 1983 for affecting a seizure of the car for the period of time it took to repair the wheel and get damages for whatever the loss of the use of the car cost? Yes, Your Honor, because there's been a— Is that really—are there such cases? Yes, Your Honor, we point to a number of cases in our brief where there are other circuit courts that have considered damage to property that is less than a total divestiture of your interest, less than destruction, less than total dispossession. The one that I would really want to point you to is the city of Charlottesville case that we cite. This is from the Fourth Circuit, and the Fourth Circuit considers exactly this argument, and they say you don't need total destruction. You don't need permanent dispossession. All you need is a meaningful interference. In that case, there was damage to a person's topiary, their landscaping, and for that period of time where their property was damaged until they were able to repair it, that's a meaningful interference. But is that right? Again, and I'm just going to go back to the 30,000-foot question. It seems to me that your argument is collapsing tort law with the Fourth Amendment, and I don't understand. You said something about de minimis exceptions, although I'm not quite sure I understand that because I didn't think that the Fourth Amendment allows the police to take, say, the suitcase away even for an hour because then you've got a Fourth Amendment. They took it. They seized it, right? Yes. I mean, I suppose if they moved it a foot away or something, then maybe you would say it didn't amount to a seizure. But how does your argument not result in any damage ever caused by a state or municipal official yielding a Fourth Amendment seizure violation? Tell me how there remains a line between those two. So there remains a line, Your Honor, because there has to be enough of an interference with the possession that she's not able to use it for the purpose of, for the possessory interest that she has. Okay. So I give you the example of the keying. She can use it. Yes. So you're saying the keying, not a Fourth Amendment violation? We do not think the keying is a Fourth Amendment violation. Okay. The billy club smashes the rear blinker, the housing. It still blinks. Yeah. We think that's probably. You can use it. Fourth Amendment violation or not? We think that's a Fourth Amendment violation. Okay. So explain why. The car works. You can drive it. Why is there a Fourth Amendment seizure? If the housing of her blinker is broken, then if she's going to continue driving that, she's going to be driving it at risk of being pulled over for damage to her car that could be perceived as improperly operating the car. So you're saying that because the police might, the government might commit another seizure? No. It is currently a seizure? It would be unlawful, perhaps, for her to use the car until that is fixed. That's correct, Your Honor. She has a right as the owner of the car to use it in the normal way that a citizen is able to use her car. And we think that that maps exactly. When you say the normal way, but, you know, Judge Lynch suggested that it would be illegal to use the car. Isn't it what we're looking for, something that's tantamount to a seizure? So we know in the easy cases, if the government takes something into its possession, that's a seizure, right? That's what we're trying to figure out. And then for interference with property to be a violation of the Fourth Amendment, it has to be something tantamount to a seizure, doesn't it? Yes, Your Honor. It has to be something tantamount to a seizure. It has to be a meaningful interference. So in the case of keying the car, it is still true that I will take it to the shop to get that fixed, and that means that the time that it's in the shop, it's not going to be available for my use, right? So, like, in a way, I have been deprived of the use. But you're just saying that the keying of it is not so significant that it amounts to them taking it away from me. Yes, Your Honor. So at some point, you're going to have to make a judgment about the line between what amounts to a seizure and what amounts to damage. Yes, Your Honor. And I think we have to keep in mind that this is a summary judgment standard, and a jury is able to perceive where that line is. And we think— I can't perceive what the line is, though. The judge needs to instruct the jury what the line is. Describe it for me. What are the words—what is the constitutional standard we tell the jury to draw the line? Your Honor, the constitutional standard is a meaningful interference with the possessory interest. And we have to trust that a jury is able to understand that when a dog is shot squarely in the chest, collapses, is taken to the vet, incurs expensive veterinary care, and then after the fact is not as playful as he once was. But the phrase meaningful interference is a way for the court to operationalize what amounts to a seizure, right? Yes, Your Honor. That is the language we're trying to accomplish. Yes, Your Honor. Right? So you think the dog was shot in the chest here, right? Yes. And if the dog was shot in the foot, and it still had to go to the vet, but just bandaged it up with a foot and it healed after a short time, that would not be so significant, right? Your Honor, that would be a much closer case. I think it would depend on the extensive care that was required for the animal. But again, that's not the fact— Well, let's say she stays with the animal throughout surgery. Yeah. I mean, I know these are ridiculous hypotheticals, but at no point is she not in possession of the dog. And she's sitting there, and the dog is getting the foot bandaged and everything. I mean, the dog never leaves her side. She doesn't want this to happen. Her dog is injured. The dog is maybe never going to be as healthy as it was before. But she never loses possession of the dog. It seems to me that this meaningful interference is a magnitude— She still has the importance of the dog if the dog is killed, does she not? Well, hang on a second. What I'm suggesting is the meaning of interference words seems to suggest the question of the magnitude of any interference, right? You can have a meaningful interference with a possessory interest, with, I don't know, any number of rights. But the possessory interest is a qualitative description of what someone's rights are. Now, I can understand that you say you kill a dog. We all understand the word dog at some cosmic level to mean a live dog, not something that's taxidermied, right?  You know, if the police had poured kerosene all over her car and burnt it to a cinder and there was ash in the driveway, you wouldn't say, well, the molecules are mostly there. But everyone would say, that's not a car anymore. So we say there's a constructive seizure, maybe you would call it. But I don't understand the line to say when you still have the thing but it's damaged, damaging something, it seems like then you get a tort action. But why is it a constitutional seizure every time the government breaks one of your things? Your Honor, what the Supreme Court has said is if your dominion over the item is not the same as it was before, then that is a seizure. And so we point it to a number of ways. It's like a Zachary thing because you, I think, agreed that there's some level of damage that could occur that doesn't amount to a seizure. So we're just disagreeing about – or I don't know if we're disagreeing, but the parties are disagreeing about where the line is. That's correct, Your Honor. And we think that we're – So if it were true in this case that the dog were shot, and I understand that your client alleges that the dog is not the same as it used to be. But let's say the dog is the same as it used to be. Like there's no question that it's made a full recovery. What would you say then? Well, Your Honor, there's been a seizure for that period of time when the dog needed that recovery, needed that surgery. There was a time where the dog collapsed and needed to be taken to the emergency vet. I don't think any reasonable owner of a dog would say – But we agreed again that if the car were keyed and it had to go to the shop and they don't have the car for a certain amount of time, it does not amount to a seizure. Right. Because the interference was not so significant that it amounts to a – I mean amounts to the equivalent of a seizure I suppose. Correct, Your Honor. But what's the distinction? So if in my hypothetical there's an injury to the dog from which the dog can make a full recovery, let's say he kicked the dog. The dog still has to go to the vet for some period of time. Would you say that that's a seizure? Your Honor, I think it would have to depend on the nature of the intrusion into the animal and the extent of the injuries. If the dog has – I understand that it does depend on it. I'm just sort of trying to find out where the line is. I mean I think I have – I can see the line that maybe the other side wants to draw, which is the reason the Supreme Court says meaningful interference with properties is trying to come up with the equivalent of a seizure. And so I have to imagine whether what happened is equivalent to just taking the thing away. Right. And that is a higher standard than you want to draw. And I'm trying to figure out where I could – what's another administrable line that you're trying to establish? Your Honor, the line is the point at which the property is not usable in the form that a person's possessory interest entitles them to use it. And so we've pointed to four ways in which there's been an interference with the possessory interest here. The first of all is, as this Court recognized in Carroll, there's something special about the relationship between people and dog. And if you see that traumatic, violent event between person and dog and there's been a serious injury to the dog, we think that that in and of itself is most likely a seizure. But beyond that, there is the direct use of – I'm sorry. You said that the emotional distress – Because I would be traumatized just to keep the dog, right? So you just said that that kind of a minor injury would not amount to a seizure. Your Honor, correct. But again, we've pointed to a number more, and we think that they combine to show that there's been a meaningful interference here. But did you say the first part was her watching it and being traumatized? No, no, Your Honor. Okay. Because that seems like that would be emotional distress. That would be a measure of damages.  But that doesn't answer the question of whether there's a cause of action to begin with. Your Honor, correct. The possessory interest that this Court has recognized in Carroll that is somewhat unique in the situation of a companion animal is the emotional bond between dog and person. But why is that true? I mean, if you took my couch, it's a seizure. If you take it out on the lawn and you torch it and it's just, again, a pile of ash, I think we would say, well, under Carroll, it's effectively a seizure. You didn't take it away. The cops don't have it. But you just write, I don't have a couch anymore. It seems like that would be the same logic. I don't see why emotional bond. What if I hate my dog? No, I'm serious. You know, I work on a farm. I have a bunch of dogs. Some of them are useful as shepherded dogs. This one is out to pasture. I've never liked it. And the police come and kill it. You're not saying that I have any more or less of a Fourth Amendment claim because I have an emotional bond to the animal, do you? Maybe not in that circumstance, Your Honor. But as we said in our brief, you also have all the other ordinary items of possession. My point is then what is the emotional bond, what work is the emotional bond doing in the Fourth Amendment analysis? Whether I love my dog or I don't love my dog or my whatever animal, I don't understand how the emotional attachment changes whether or not I have a possessory interest. Well, I think the court has just recognized that this is somewhat of a sui generis context. Why? Why is that? I don't see why we have. For many people, an animal that is in their house is the same as a member of the family. Why do we need to go there? I don't understand that. We don't, Your Honor. I mean, is it not relevant that what was done to the dog here was shooting it? Yes. The use of lethal force. Yes, Your Honor. And the lethal force was being done in the course of a law enforcement operation. This is not a police officer who happens to be a police officer, keys your car because he doesn't like you. That would be a tort, but it has nothing to do with the Fourth Amendment. It's not if he goes in your house and burns your couch because he doesn't like you. The question here is when a law enforcement officer uses deadly force, we're going to say that it's a seizure or not a seizure. It is a subject of Fourth Amendment interest if and only if the dog happens to die, but not if the dog happens to be grievously injured by a police officer in the course of his law enforcement activities using force. Now, whether the force is reasonable or not is a whole other story, and it may be reasonable or it may not. But the question for some reason that the qualified immunity issue seems to be hanging on here in the view of the defendant and the lower court is that it isn't a seizure, not that it was within some zone of maybe it wasn't reasonable, but it was close enough that there should be qualified immunity or something like that. It's all about whether this is a Fourth Amendment issue at all. And the answer that is being propounded is that it's reasonable to say that if the lethal – use of lethal force works and the dog dies, then it's a seizure. But if the dog is immobilized, has to be – had surgery to survive, then the Fourth Amendment is not implicated at all when that is done in the course of law enforcement operations. I don't know why – to me, that's the issue, not – and it doesn't necessarily depend – the fact that the dog is animate makes a big difference to everything in the case compared to a car or a couch. But it's hard to see why the seizureness of what happened is to be made to depend on the – whether it's a temporary deprivation of your ability to use the dog. It's not just whether you're still with the dog in the hospital. It's a hospitalized dog is not functioning as a dog for that period of time. That's right, Your Honor. OK. Yeah, Your Honor, I think you're pointing to exactly the problem with the city's position. And even the district court below agreed that there was a seizure here or that a jury could reasonably – Can I just follow up on that? So if the officer shoots at the dog intending to kill it and misses entirely and nothing happens to the dog, has there been a seizure? Your Honor, we think probably not. OK. So you're telling me that there could be an application of deadly force by an officer and whether it's a seizure or not depends on the happenstance about whether the bullet actually makes contact with it or not? Like how could it possibly be that if an officer is using deadly force toward a dog, that whether it's a seizure depends on the result of that application of force? Well, Your Honor, it's often the case that an officer can act unreasonably in a circumstance, but whether there's liability for that is going to depend on what happens down the line. Right. So it does matter whether the injury to the dog is tantamount to a seizure or not. It doesn't – like it's not surprising that the result of the application of force would matter to whether something qualifies as a seizure, right? Yeah. Sure, Your Honor. If the officer shoots at a person who is running away and doesn't hit the person and the person gets away, that's not a seizure. Isn't that clear? I believe that's correct, Your Honor. But if he hits the person and the person falls down and the officer then comes over and puts the person in custody, that's a seizure. Yes, Your Honor. But it doesn't depend on whether he's killed. No, Your Honor. It depends on the reasonableness of the act. But that's because the person has a right not to be seized, right? I mean the person has been seized or immobilized or changed. That's different from property being taken away from the person, right? I mean these are different analyses. The cop is seizing the person there, right? Your Honor, if a bullet strikes a person, the police officer has seized the person. And Your Honor is correct that the analysis is different. This is a property-based inquiry. It depends on whether there's been a meaningful interference. So during a search, if the police handcuff the occupants of the house and confine them to the garage, that might be reasonable or unreasonable, but it is a seizure, right? Yes, Your Honor. If they move chairs to the garage while they're investigating other property in the house, that's not a seizure. Your Honor, we think likely not. That's a little bit different from, for instance, the circumstances. Okay, but I'm just sort of saying like it's not obvious that what amounts to a seizure of a person is the same thing as what amounts to a seizure of personal property. Correct, Your Honor. We don't think the inquiry is the same. It is a property-based inquiry. But we think that when a dog has been shot, it needs to go to the vet. It needs to receive emergency care. There is at least a period of time where that dog is not being used the way a dog is meant to be used. So can I ask you this? We've been talking and it seems like it's a difficult case to wrestle with. This question of is the dog seized, is the dog not seized? Sure. Is that not an illustration that the clearly established prong of qualified immunity has not been shown here? Because there is case law saying if you kill a dog, it's a constitutional violation. But we don't have any case law saying that wounding a dog is a constitutional violation. And there are competing analogies one might make. One might say, no, what underlines Carroll is just shooting the dog. It's the use of the force. And then there's the other analogy that says, no, no, no, it's personal property. It's you damage a car, your decision whether or not you're going to take it to the auto body shop, that's on you. I mean, I have so many dents in my minivan, I can't even tell you how many are there. And I have not chosen to take it to the body shop. I live with it. And guess what? I drive the van. My possessory interest has never been interfered with, with all those many, many, many dents. But that doesn't mean that the dents aren't there. It doesn't mean that the value of my minivan hasn't been dramatically depreciated because of that. Two different competing analogies, right? And doesn't that illustrate that the district court was right at a minimum on the clearly established front to say, wow, this is an open question? Your Honor, we don't think so because the purpose of the qualified immunity inquiry is to focus on the conduct of the officer. The question for whether a right is clearly established is, does the officer have fair warning that his act is going to produce constitutional liability? And so, of course, there is a question of down the line. As Your Honor is pointing out, there is maybe debate on the extent or the exact line at which there is a seizure or not. But the act that Officer Van Bredero committed is no different from the act that this court— Yeah, but we do that analysis from the perspective of a reasonable officer, right? So I understand that in this case, I mean, maybe there isn't a direct determination, but I assume that he did shoot to kill the animal. But like in principle, a reasonable officer could be thinking to himself, well, it's a constitutional problem if I kill the animal but not if I wound it nonfatally. And maybe he might behave differently based on that rule. So how do we think about the qualified immunity analysis? Is it enough that we think that this guy was not making that distinction? Or is the fact that a reasonable officer could make that distinction mean that that means that we should stick to clearly established law? Two answers, Your Honor. The first is the question is whether an objectively reasonable officer under the circumstances would have conducted himself differently with the knowledge of what case law says. And so we need knowledge. Is that the standard that he would have conducted himself differently? I thought it was that he would know that what he was doing violated clearly established law. Correct, Your Honor. So that doesn't mean he could still do the same thing. The question is whether he would know I'm going to do this. I'm going to do it. I am violating the Constitution. And I guess, again, it's sort of reflecting sort of this debate that we're having in court that there seems to be, to me at least, some serious debate that there is a violation of the Constitution here. But why would a police officer absolutely know, oh, I'm going to shoot? You betcha. I'm violating the Constitution here. How would a cop know that? So, Your Honor, we think that it is fairly clear that if an officer is using lethal force that they understand that the foreseeable consequence of doing that is that the animal might die. And, in fact, Lieutenant Quila in the summary judgment record testifies as the city's 30B6 witness that that is the foreseeable consequence. So why wouldn't that be the thing that sort of the cop says, OK, I know I'm taking my chances here. If I kill that dog, I'm in Fourth Amendment soup. Yes, Your Honor. But if I don't, then I'm OK. So I'm going to take my chances. I don't know. And then, yeah, if the dog dies, he's got to live with the consequences in Carroll. And if the dog doesn't die, then he doesn't. And he says, I know I'm taking a chance. Your Honor, there's nothing in the record to suggest that Officer Van Bredero had any idea that he would. No, no, no. It's a reasonable inquiry. It's an objective inquiry. It doesn't matter what he thought. Your Honor, at the very least, I think that would generate a question of fact of is this the type of shooting that would be sure to lead to the death of an inmate? No, but I think the question originally, and I think Judge Jardini was also trying to press this point, is does it hinge on what this officer himself was thinking? Or is it about the perspective of a reasonable officer and the rules which a reasonable officer would conform his or her conduct? It's the perspective of a reasonable officer, and we think any reasonable officer in the Second Circuit is on notice that if they use lethal force and a Fourth Amendment violation results from that, that they've been informed by Carroll that that is the— Okay, so we have a pretty extensive record because we have all of the body cam footage. We haven't talked just about the reasonableness of the thing itself. So what about that? So it seems like the officers tell Ms. Cox, keep the dog locked up, and she responds by – and they say that a number of times. She responds by saying, he's okay. Don't worry, which seems to be an acknowledgment that she would do that. The officers see a pretty large dog jumping and barking behind a clear door, and then she lets him out. From this officer's perspective, he's on the porch, so he doesn't know if the dog escaped or she let him out or what happened. But the dog gets out, and then when it appears before him, it's chasing this other officer who's running away from the door. And it's nighttime, so you can't see sort of a nuanced expression on its face. You just see that the dog is – a large dog that was supposed to be locked up is chasing the other officer onto the porch, which is an enclosed area. So under those circumstances, why isn't it just reasonable conduct by the officer? Well, Your Honor, there is a fact dispute specifically about whether Taz was chasing the officer or just happened to be running loose at that point. But I think the further – He just happened to be running, but he just happened to be running behind the officer in the exact same path that he was running in. And then it goes up onto the porch where the officer went. Your Honor, that is a quintessential dispute of fact. We have – But actually, I'm asking why it's a dispute of fact. So as I just described it, it's like a very big dog that they have warned the tenant about, and she has said she's going to keep him locked up, escapes, is chasing another officer. Why isn't it reasonable for him to disable the dog in those circumstances? Your Honor, the dispute of fact is whether it was reasonable, and we think that a jury could reasonably conclude – Isn't it a disputed fact whether the dog was running at all? So you can look at the video and see the dog is moving, and you could describe it as running. But there is a dispute of what was the dog's behavior otherwise. Was the dog barking, growling? We say no. In fact, they actually agree by the point that he's outside of the house. He's not barking anymore. He's not growling. His ears are pinned back. His posture doesn't look aggressive. Oh, wait. Hold on. So he was barking in the house before he got out. Yes, Your Honor. Right? Then he gets out of the house, and he pretty quickly follows the officer onto the porch, which you say, you know, that could be running. But the thing that should counteract that impression that that seems threatening is that his expression was playful. How do you know that? The video doesn't really show that. Right. We don't think the video shows things clearly one way or another. One thing the video does show is that Officer Van Bredero had positioned himself in a way that as the instant Taz came into view, he shot. And so at the minimum, Officer Van Bredero did not take any time to evaluate. It wasn't the instant he came into view. He came into view after his fellow officer was chased by the dog. Officer Pascoe comes onto the porch. Taz comes into view. And the instant Taz comes into view, Officer Van Bredero shot him. And we think there's a clear dispute of fact of was that shooting reasonable. And the district court agreed with us on that point. Because there's an account from Ms. Cox that says he wasn't behaving aggressively. There's an account from Van Bredero saying we thought he might have been. And that's for a jury to decide. That's what the summary judgment procedure is all about. And that's what the district court agreed with us on. Counsel, we have kept you up here considerably past your time. We appreciate it. You have reserved three minutes for rebuttal. I think we are going to take a breather. We're going to hear from counsel for the appellee. But don't go away. Thank you. Ms. Jones. Thank you. May it please the court. My name is Peachy Jones. I represent the city of Rochester and Dakota Van Bredero, the defendant's monopolies in this case. Could I just ask you to tilt that microphone up and just make sure you keep your voice up so we can hear you?  Absolutely. I'll do my best. So in 2013 in Carroll v. County of Monroe, the Second Circuit clearly stated that killing or destroying a pet animal could be a seizure under the Fourth Amendment, and that when unreasonably done would be an unconstitutional seizure. The cases that were cited by the Second Circuit in that decision and cases after the fact that it was cited to Carroll clearly established or confirmed the precedent in that case that the court was concerned with a complete destruction or complete loss of a pet. Because Carroll was the only law in effect at the time of the incident in this case, we believe that the court should grant qualified immunity to Officer Van Bredero because it wasn't clearly established that anything short of killing or destroying a dog could constitute a seizure. We thought that the officer here shot with the intent to kill, and so therefore he took the action that if the expected result had occurred, it would violate clearly established law. Does that mean he shouldn't get qualified immunity? Are you saying that hypothetically if he took the – or if he shot the dog with the intent to kill? I'm not sure. I guess I have two questions. One is do you agree that the record suggests he did shoot the dog with the intent to kill, that he was applying lethal force? And two, does it matter what his subjective intent is, or does it matter just what the consequence was? Unfortunately, I don't remember anything specifically in the record that spoke to Officer Van Bredero's intent with why he was shooting his dog. He shot the dog in the chest, right? In the chest is kind of tricky. I believe there is a scar on the chest. There's no actual evidence of whether the bullet went in or just kind of struck it underneath. So is it possible that he was shooting not to kill but to – just to disable the animal? Is that possible? Yes, that is possible. There's no other evidence otherwise. Okay. So then I get a sense of what the record is then. But like – so I guess my question is does that matter? So does whether he gets qualified immunity hinge on whether he acted in a way that would be expected to kill the animal, or does it only hinge on what results transpired and therefore whether that result was a seizure under clearly established law? Correct. It only depends on the actual outcome of what actually happened. So here the dog was not killed, which is – what is a seizure under Carroll v. County Monroe? So because there wasn't – because it was not fairly wounded and that was not yet established by Carroll, that Officer Van Bredero is entitled to qualified immunity. So that's the second – well, are you applying the first and second grounds of qualified immunity? Did you bake them both into that statement about whether there is a violation and even if there was a violation, a reasonable officer would not have known he was violating a clearly established right? Were you saying both or one? If I did, I did not intend to collapse the two. They are two separate inquiries. We believe that the second part is very clear. I think as the discussion earlier here today indicates, that it's not clear that non-fatally wounding a dog would constitute a seizure. How do you fit that? Because I think one of the arguments is how do you reconcile that argument under qualified immunity with what a reasonable officer would know they were doing? Because a reasonable officer will know what force they're applying, right? I mean, they're shooting a gun, right? They're using lethal force. It's potential they won't know the outcome of that. Just like when you shoot somebody, you know, you shoot a fleet suspect. They shoot them, but they don't know. Are they going to kill them? Are they going to wound them? Are they going to miss entirely? But you can talk about what the officer knows, which is that they're using lethal force. I think the argument the other side is making is it seems to be a mismatch with the second prong of qualified immunity, what a reasonable officer would know, if the only thing they can know is what actions they're taking, not what the consequences may wind up being one way or the other. And so that's where I'm wondering how do you, if you were to assume that there was a constitutional violation based on injuring the dog, how does that square with the second prong for you? So I feel like I thought that question was going in a different direction. Yeah, I may have thrown a wrench in there. Let me back that. You're right. I added another factor there, which is assuming there's a fourth violation. Let me take that out for the moment. How is it that the qualified immunity determination can ever be determined based on what a consequence is and not based on the actions of the officer? Because that is currently what the state of the law is. In Carroll versus County of Monroe, it talked about the end outcome. It talked about killing or destruction or the removal. It didn't talk about the actions that an officer took in getting there. So you're saying this is a quirk of this particular violation as the law currently stands. The only thing we've said is there's a violation if there's a consequence because the police officer can't know in advance what the consequence is, then qualified immunity applies. If we were, I guess one variant of the argument would be to say if we go ahead and hold that the violation is not consequence dependent, then the police officer can't get off the hook under the second prong of qualified immunity. But as it presently stands in your view, the only thing we've said is there's a seizure if the consequence follows, therefore because, I guess I don't know how to fill in the because. So, yes, that is correct. I believe that the Second Circuit could have stated that they were more concerned with the firearm discharge if that was the concern. But in the case they were talking about the complete loss of the animal, which was through destruction, or in the other cases that were cited by the circuit, when the dog was removed. So because the Second Circuit in that decision didn't talk about the actions by which that complete loss of possession was carried out, no, an officer is not going to understand that simply discharging their firearm could constitute a seizure. A reasonable officer who knows that if he kills the dog he's violating the Constitution and takes an action, the use of lethal force directed at the body of the dog, that he knows runs a significant risk of killing the dog. A reasonable police officer would take that shot. And again, we have to assume for the purposes of this that that use of force would be determined to be unreasonable, and that's an entirely separate inquiry. But there's just no Fourth Amendment question because a reasonable officer might well think I'm entitled to take the risk that I'm violating the Fourth Amendment by effecting a seizure. So under your hypothetical, it sounds like the officer is taking or discharging the firearm at the dog with the intent to kill? No, not necessarily. Look, this is all outside the record, but police are actually trained that if somebody is attacking, if a person is attacking them, they're not supposed to shoot at his hand to try to get the gun out of his hand because that won't work except in Western movies. They're trained to shoot for the body because that's the only way you're sure you're going to disable the person. They don't necessarily have an intent to kill, but they are using lethal force, and the lethal force has to be justified. And we're not shooting to wound. We're shooting to stop the person. So I'm not putting the intent into this question. You're using lethal force in a way that you know is likely or reasonably likely to have a fatal result if it does what you want it to do because what you want it to do is to be sufficiently disabling that the attack is going to end. So I strongly disagree that jurisprudence with respect to forces that apply to people should be considered at all in this case when we're talking about property. They are very different. People have constitutional rights. Property does not. And so, no, if there's no actual meaningful interference with the possessory interest of the actual owner, I don't think that there is a seizure. Okay, let's get away from dogs and emotions and lethal force. Officers are executing a search pursuant to a warrant. They come into somebody's house. They're reasonably entitled. They're entitled to search the property. There is a valuable chest. It's locked, but the key is in the lock. Instead of turning the lock, the officer yanks the cover right off the thing, causing, because it's an antique, thousands of dollars' worth of damage, but more importantly, it's no longer a chest that the person can use, and they're going to have to take it to be repaired if they're ever going to use it again. That's not a seizure of the chest? No, I think it would be, because if the top has been ripped off of it, I mean it's no longer really going to be able to function as a chest. Well, if the dog is, let's assume the dog is a watchdog, and the dog's purpose is not to chase cops but is to chase burglars, and you've rendered the dog useless, at least for a period of time, to do that function, why is that different than what, in my hypothetical, the officer did to the chest? Again, the assumption has to be for it to be a constitutional violation that this was unreasonable behavior. This may not have been unreasonable behavior, but that's not what we're talking about here. We're talking about whether a reasonable officer would be on notice that this is a seizure, which is to say an object of constitutional inquiry. So you said rendered useless. I think my answer kind of depends on what you mean by rendering a dog useless. I think part of the difficulty in this case is that dogs, or at least this pet dog doesn't have kind of like a clear function by which, like, you could objectively say that a possessor interest has been undeterred. Whatever the dog's function, whether the dog is just, I like to cuddle the dog, whether the dog actually is, I never use him in the house. I take him out to the fields to guard the sheep. Whether the function is to be a guard dog. Either way, if he's in the hospital, he's not doing that, right? I'm assuming that you mean that he's in the hospital because of the firearm discharge? Well, if he is in the hospital for whatever reason, he's not performing the functions for which that piece of property is owned, right? And if the reason he's in the hospital is because he was shot, that still doesn't mean there's a constitutional violation because it may have been entirely reasonable to shoot the dog. But the question is, is this a meaningful interference with a possessory interest when you, for a period of time, render that piece of property useless for its intended purpose? You said yes for the chest, but not for the animal. I think under your hypothetical, I would be inclined to agree with you because you have specific functions of your watchdog, but here there are no such facts. So I think this was in your brief. I think you said, like, if the dog were a show dog and just an injury would prevent it from being a show dog and that's the nature of the thing, then maybe that would be a complete deprivation of the property because it didn't serve a purpose other than something that it can no longer do. But a regular companion animal that might be expected to be in the hospital sometimes and be moody sometimes and whatever, like, it has not been a complete deprivation. But the standard is whether it amounts to deprivation of the property, right? So two things. So the Supreme Court standard is meaningful interference with a possessory interest. If you're talking about care roles specifically and whether it was a complete deprivation, I think that no, just being wounded wouldn't constitute a complete destruction or loss of your possession. But if under a Supreme Court precedent you're just talking about a meaningful interference, I think that yes, if there are functions that a dog has, so that if the identified function or purpose of that dog is materially or significantly impacted by an officer's actions, that yes, if you can no longer show your show dog or you can no longer go hunting, I think that that would be a significant interference with how you possess and function that dog. Or function the dog, yeah. So can I just ask how that – maybe this is crossing different factors. Maybe the seizure question about unique natures of property, right? I have a show dog or I have a car, an antique car, whose only value is that every part is original, you know, is its value. It's an antique, you know, a Chevy Corvette and its value lies in the fact that all the fenders are original. And you'd say, well, you damaged the show dog, it can't be a show dog anymore, you know, to the point where it can't prance or something or it's disfigured. Or you would say, well, you damaged the fenders so it's no longer an original Corvette. Now it's going to have replacement fenders or something. How is a police officer supposed to know about unique idiosyncratic qualities of property that is damaged? I mean, does that then come into the reasonableness part of the analysis? Does it come into the second half of the qualified immunity analysis to say, well, you know, whether a reasonable officer in that position would have known about the qualities? I guess, so if someone said, hey, come on to my property, look at my show dog and then shot it, is it different as opposed to just a dog running out? Like in this case, if unbeknownst to the police officers, this dog really was a show dog. Would that factor into the seizure analysis of, you know, was there meaningful interference in the possessory interest? Or would it factor only into what a reasonable officer would have known? I believe the first part, so whether or not. So it would get baked into, in your view, whether there was a seizure. Correct, but not the second. But not the second. Whether or not. Would the police officer then be, I guess, I guess it would be a fact-dependent inquiry, in your view, about whether the police officer was reasonably unnoticed that that, if there was a factor about the property that made it unique, then the question would be, would the police officer reasonably have known about that factor that rendered the interference of constitutional magnitude? I'm just trying to get my head around that. I understand qualified immunity, or at least the second prong of that, as to whether or not the courts have clearly established that something is unlawful. Well, it's really two parts, right? Sure. And the second part is about whether the right was clearly established, such that the officer would have known that the officer's actions would be violating that right. So it's kind of two parts, right? Is the right clearly established, and would the officer understand that what they're doing is going to violate that right? You know, you can understand, you can say, look, I understand you have a show dog, and you have a constitutional right not to have it seized, and then the cop, I don't know, drives out of the driveway and accidentally runs over the dog, you know, without realizing it and through no negligence or anything. So then you would say, okay, you know, yes, there is a clearly established right not to injure the dog, but no reasonable officer in that position would have known that they were about to do that thing that they're not allowed to do, right? You can break it into two parts. That's correct. I do not know. I think what's more important, or at least to us, is that at the time of this incident, it was not clearly established that doing anything short of killing a dog could be a seizure on the Fourth Amendment, and so Officer Van Breda Road is entitled to qualified immunity. I guess everybody seems to agree that there is some line between mere damage to property and what amounts to a seizure, right? Correct. And that depends on the nature of the thing. A tear in a couch might not amount to a seizure because you can still use the couch, but a tear through a Picasso painting or something might be a more significant thing that basically is a destruction of the property. Absolutely. And so part of that analysis might be whether it's like an ordinary companion animal or it's a show dog or it's a watch dog or something else. I agree. Okay, so then that's there. But then it might be that part of the reasonableness analysis also depends on the thing. I mean, if a dog can respond to inputs, if the homeowner says, you know, my dog is very passive, but if you raise your hands above your head and wave them back and forth, it will freak out, and the officers just gratuitously do that, we might say that that is an unreasonable interaction with the dog because they could have just avoided that, unless for some reason the circumstances made it necessary, but I'm trying to come up with something that's not necessary. Sure. Reasonableness is determined on the totality of the circumstances. And so, yes. But if it's unreasonable, that does inform whether it's a violation in the first place, but then we also need it to be a seizure. Correct. I think the courts, I think what's established by this case is that there aren't a lot of cases that discuss nonfatal woundings of dogs, and so the courts below really don't have a lot to offer guidance on this, which is why Officer Venbrode is entitled to qualified immunity. I will also say that we also ask that the court grant summary judgment on the municipal liability claims in this case. The court was correct below in establishing that plaintiff appellants have not demonstrated a history or pattern of unconstitutional conduct. I think we understand that argument. What you haven't talked about is just whether the officer's conduct was reasonable, even assuming that there is a seizure. So, you know, I had suggested, you know, from the perspective of the officer, the owner had been warned to keep the dog locked up and said she was going to keep it locked up. It gets out. It's chasing another officer, and it shows up on the porch. But opposing counsel suggested that a jury still could decide that it was a reasonable reaction to shoot it at that point. Do you agree with that? So it's our understanding that the court must accept the plaintiff's view of the facts that are disputed, and so if we have to accept that the dog was walking slowly down the driveway playfully and not showing any sort of imminent risk of harm, then, yes, it would be unreasonable to discharge her firearm in those circumstances. We just support, of course, to strongly dispute that that is what was occurring. Back to Manel. We believe that in order to establish deliberate indifference, plaintiffs must show that there's some sort of history of prior constitutional conducts that would put a municipal policymaker on notice that there needs to be some sort of change in supervision or training. And here the district court correctly decided that there is no such history and that this particular case is not exempted from showing a history or pattern of unconstitutional conduct. Also note that in Supreme Court cases up until this point are concerned with an absence of training or complete failure to train. This type of second-guessing and micromanaging that plaintiff appellants are doing to the city of Rochester is the exact type of analysis that the court wanted the federal courts to avoid and specifically said so in the city of Canton. They're looking for complete absence, not municipalities that are doing their best and acting reasonably. Here the plaintiff appellants don't dispute that our trainer formed the training or developed the training with the assistance of a behavioralist, that he was a law enforcement officer for over 20 years, that he currently works for the Humane Society and works with dogs on a regular basis, that he consulted and incorporated training from all of the best practices that their expert identifies, and then showed videos to help officers look through or work through how to respond to dog encounters. Yeah, something you don't do very much of in the brief, and I wonder about this, is look at the numbers of shootings in Rochester and compare them to other places. And something that struck me is that it's not easy to make that comparison based on the data in the record because there are differences about how many dogs are shot, how many dogs are killed, and so on. But the big number that Dr. Crosby refers to is 66 dogs killed in Rochester over 8 years, which averages to something like 8 per year. Then, when he's talking about the training that did such a wonderful job in Milwaukee and Buffalo, for example, in reducing the number of shootings there, the good result that they achieved was to get down to something like 20-something in Buffalo and 50-something in Milwaukee. But Milwaukee is twice the size of Rochester and Buffalo is only a little bigger than Rochester. In other words, Rochester is still on a per capita basis doing better at not shooting dogs with the training that their officers got than the people in these other cities got using the means that Officer Crosby says they should have used. That seems to me to be a pretty significant fact if we're talking about whether there's a pattern in practice of wrongdoing, quite independent of this incident, and whether the city is doing a decent job of training or not, right? Do you agree with that? No. No? You think they're doing a bad job? I just told you that Rochester is doing better on the numbers than Buffalo and Milwaukee are doing. I guess I misunderstood what you said. Yes, I agree. Sometimes someone's serving up an underhand softball. I'm just surprised that there was no such analysis of that. Because one question you might ask is if in Rochester the numbers were way out of control here and in these other places that have different kinds of training, dogs never get shot. That would be an interesting phenomenon. Of course, all of this only comes up if there was an unreasonable shooting here for them to be responsible for. So this is a secondary kind of issue in the case, and you'd have to get over the first issue of is there any liability by anybody here. But once you – and that wouldn't be a qualified immunity either. That goes to whether it was unreasonable. But if it is unreasonable, even if the officer has qualified immunity, there might be a possibility for Monell liability. But it would seem to me that you'd have to make some kind of showing given that, as you say, they did have some kind of training. And I guess maybe I'm really directing this at your friend on the other side for when he gets back on rebuttal. If the numbers show that they're doing at least as good a job at preventing fatal dog shootings as some of the places that the plaintiff's expert holds up as exemplary, it's hard to find a case for Monell liability. Why don't you swing at that pitch, and then we're going to hear from you. I think all you have to do is say yes, and then you can sum up. Exactly. I'm sorry. Earlier I thought you were going to just pointing to the number of shootings as being some sort of evidence of training being unreasonable. But we would argue that you need to show that there were shootings. Just a small clarification I want to make. So the district court granted summary judgment to the city, right? That's correct. There's no more pending claims left in the district court, right? I think they declined to exercise supplemental jurisdiction. So it's an appeal from final judgment, right? So it's not a case where we're bound to accept the facts as alleged by the plaintiff. We could affirm based on anything in the record if we thought that the actions of the officers were reasonable. Yes. Okay. With that, thank you very much. And we are going to hear from counsel for the appellant. But three minutes of rebuttal. I know there's been a lot of discussion, so these are just three minutes of last thoughts. Thank you, Your Honor. May it please the court. Quickly on the violation, we do want to say I think that there are two very clear instances of meaningful interference here, even putting aside the emotional bond between dog and owner. So the first that we pointed to is the shooting of Taz that resulted in him collapsing and needing to take him to the vet for emergency care. For at least that period of time, he was not being used as a dog the way that he should. And there is also record, there's plenty of evidence in the record to show that he's not the same dog that he once was. She can't play with him the way that she used to before. So we think that there has been a meaningful interference in the use and enjoyment, the direct possession of Taz in those two ways at the very least. Second, on qualified immunity, as Your Honor pointed out, we think that any reasonable officer is going to know what kind of force they're applying. They're applying lethal force. And the question Your Honor has raised is does the underlying or the downstream consequence of that, does that affect the analysis? And we don't think it does. One case I would point you to is Caskey v. Fenton. This is a Sixth Circuit case from 2022. The citation is 2022 Westlaw 16964963. This is about malicious prosecution. And there, of course, is one element of malicious prosecution, which is, is there a dishonest statement that an officer has made and does that lead to a prosecution? But, of course, there's a far downstream element of malicious prosecution, which is favorable termination. Does the case ultimately wind up with a prosecution or not? And what happened in Caskey v. Fenton is there was not clearly established law that the type of favorable termination in that case was a version of favorable termination. What happened there was the prosecutor voluntarily dismissed the case. And it hadn't been established in the Sixth Circuit before that that was a type of favorable termination. So what the Sixth Circuit said for qualified immunity was we have to look at what the officer knew he was doing at the time and what does case law inform him of. And whether, you know, some element downstream is clearly established or not is not relevant for the clearly established inquiry. So I urge you to look at that case. On the Monell claim, what we would say is, you know, the Supreme Court has recognized City of Canton all the way through Koenig. There is at least a type of claim that is available that doesn't require a pattern. And we think that we satisfy that here because of the Walker deliberate indifference standard. This case, this court adopted Walker specifically looking at that footnote in City of Canton. As it later put in Reynolds, this is the type of circumstance that informs the city that they need to be on, that they have a duty to act. And then what the plaintiff needs to do is point to a specific deficiency in the training protocol. This is a summary judgment standard. And we have pointed to a lot of evidence, including this very thorough report by Dr. Crosby, explaining exactly why the city's training protocol is deficient. So Your Honor's question is – Well, actually what he's saying is there are better trainings out there. And it seemed to me that he was pretty much opining that if you don't use the Justice Department's training, you're being deficient. And I don't understand why that would be true. They crafted a training. It addresses the kinds of issues that are there. And the result seems to be that there's nothing that separates Rochester from the places that have utilized the things that Crosby says you should use. So I'm having trouble understanding. How is it deliberately indifferent? If – okay, there are instances of unreasonable dog shootings out there. Let's presume that's the case. There's plenty of instances of police brutality against people that take place. It's part of what happens in human nature. Cities take steps to train and control their officers to minimize that. But if they're not doing – if their training is not doing a worse job in solving that problem, then the places that are using what the expert says are the proper means, how can you say they're deliberately indifferent to – they didn't ignore the problem. And what they're doing seems to be about as effective or ineffective as the purported gold standards are. So, Your Honor, we don't think that what they're doing is as effective or ineffective as what these other comparator cities are doing. Your Honor noted that – It's eight fatal shootings per year over an eight-year period for a city of 211,000 people. In Buffalo, they have more shootings than that, but not that much more, and it's not that much bigger a city. It's 280,000. Milwaukee is about twice as big. They have more than three times the number of shootings, and that's what Officer Crosby points to as the great effects of the training that he proposes are that it cut it down from way higher than that to a number that is on a per capita basis about the same as Rochester has. So, two responses, Your Honor. First, Dr. Crosby did not only point at those other trainings. He's pointed to deficiencies in what Rochester itself does, and that's what this court has said we need to do is point to specific deficiencies. With the comparator, and what this court said in Reynolds is we need to show that there's been a deliberate choice between alternatives. So we think that these alternative trainings is meaningful, and we think it's very meaningful that we have seen such a dramatic reduction in these other cities. It might be true that there's a per capita comparator that's closer, but if Dr. Crosby says what Rochester does doesn't prepare officers at all, there are alternatives out there. This court said in Reynolds we need to show a deliberate choice between alternatives, and if there are alternatives out there, and those have led to dramatic reductions, then there's reason to think that that same reduction would happen in Rochester as well. And so we think that it's nonetheless meaningful, even if on a per capita basis, Rochester's not an outlier, that it could have a dramatic reduction. And, of course, another example that's pointed to in the record is Chicago. It's a much bigger city, but on a per capita level, the rate of shootings is much lower after the implementation of the training. So we think this is a summary judgment standard. We've pointed to specific deficiencies in the training throughout, not just the problems with the one training PowerPoint that the city shows, but also, for instance, the instruction admitted by Lieutenant Quila that they specifically instruct officers don't use tasers, that they don't train officers on the use of any alternative but lethal force, combined with all the problems he's pointed out about the training, combined with the fact that none of the officers recall anything from the training. If you point to all of that, we think that we've shown enough for a jury to say this is fundamentally flawed, and that's what this court said you need to show it, okay? And anyway, just so I'm clear about the procedural posture, the expert's report was not excluded by the court. That's correct. So that's part of the record that is there. It's part of the record. Was there a challenge to whether it was admissible? Not in this case, Your Honor. So there's not even a question as to whether that is a suitable expert to offer? Yes, Your Honor.  Okay. Thank you both very much. We will take the case under advisement. We'd like to thank you both. These are very interesting arguments today, so a little bit different from what we usually see. Thank you.